UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

ROBB & STUCKY LIMITED LLLP,
a Florida limited liability limited partnership,[1]

      Debtor.

_____/

Case No. 08-11-bk-02801-CED
Chapter 11

ROBB & STUCKY LIMITED LLLP,

      Plaintiff/Counter-Defendant,

v.

NORTH AMERICAN BANCARD, LLC
and
GLOBAL PAYMENTS DIRECT, INC.,

      Defendants/Counter-Plaintiffs.

_____/

Adv. Pro. No. 8:11-ap-00322-CED

**DEBTOR'S AMENDED COMPLAINT[2] FOR (I) TURNOVER AND ACCOUNTING PURSUANT TO 11 U.S.C. § 542(a), (II) BREACH OF MERCHANT AGREEMENT, (III) DAMAGES FOR BREACH OF SALE ORDER AND THE AUTOMATIC STAY, AND (IV) AVOIDANCE AND RECOVERY OF UNAUTHORIZED POSTPETITION TRANSFERS PURSUANT TO 11 U.S.C. §§ 549(a) AND 550**

Robb & Stucky Limited LLLP (the "**Debtor**"), by and through undersigned counsel, files

this *Amended Complaint For (I) Turnover And Accounting Pursuant To 11 U.S.C. § 542(a),*

*(II) Breach Of Merchant Agreement, (III) Damages For Breach Of Sale Order And The*

*Automatic Stay, And (IV) Avoidance and Recovery of Unauthorized Postpetition Transfers*

*Pursuant to 11 U.S.C. §§ 549(a) and 550* (the "**Amended Complaint**") against North

American Bancard, LLC ("**NAB**") and Global Payments Direct, Inc. ("**Global**", and together

---

1 The last four digits of the taxpayer identification number for the Debtor are 6415.  The mailing address for the Debtor is 14550 Plantation Road, Fort Myers, FL 33912.

2 This Amended Complaint (i) amends the allegations contained in Count III of the original Complaint [D.E. 1]; and (ii) adds Count VII Recovery of Avoided Transfers - 11 U.S.C. § 550.

with NAB, the "**Defendants**"), and in support thereof, alleges as follows:

## Jurisdiction

1.      This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue is proper in this District pursuant to 28 U.S.C. § 1408.

## General Allegations

2.      On February 18, 2011 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11, title 11, United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**").

3.      The Debtor is operating its business and managing its affairs as a debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

4.       Prior to the Petition Date, on or about October 23, 2008, the Debtor executed a Merchant Agreement establishing the credit card processing relationship between the Debtor and the Defendants (the "**Merchant Agreement**").  Pursuant to the Merchant Agreement, the Defendants act as the Debtor's sole processor of Visa, Mastercard, Diner and Discover credit card transactions, and provide equipment to process credit card charges at the Debtor's stores.  A true and correct copy of the Merchant Agreement is attached hereto as **Exhibit A**.

5.      On the Petition Date, the Debtor filed its *Emergency Motion for Approval of Procedures in Connection With the Sale of All or Substantially All of the Debtor's Assets, Authorization to Enter Into Stalking Horse Agreement in Connection Therewith, Approval of the Payment of Stalking Horse Protections, and the Setting of Related Auction and Hearing Dates* [D.E. No. 33] (the "**Bidding Procedures Motion**").

6.      A hearing on the Bidding Procedures Motion was held before the Court on February 23, 2011.  On the same day, the Court entered an order [D.E. No. 64] (the "**Bidding Procedures Order**") granting the Bidding Procedures Motion.

7.      Pursuant to the Bidding Procedures Order, (a) objections to the sale or to the agency agreement governing the terms of the sale (the "**Agency Agreement**") were due by March 4, 2011, (b) an auction was scheduled for March 7, 2011, and (c) a hearing to consider approval of the sale was scheduled for March 8, 2011.

8.      On or before March 1, 2011, the Defendants unilaterally established – without notice to the Debtor and absent any authorization from this Court – a $300,000 reserve or holdback as security for prepetition chargebacks of credit card customers of the Debtor who used Visa, Mastercard or Discover credit cards.

9.      The Debtor conducted the auction on March 7, 2011.  The Debtor selected a joint venture comprised of Hudson Capital Partners, LLC and HYPERAMS, LLC (collectively, the "**Agent**") as the winning bidder for the rights to conduct the liquidation sales at the Debtor's stores in accordance with the Agency Agreement.

10.      On March 8, 2011 the Court conducted a hearing to consider approval of the Debtor's selection of the Agent.  On March 9, 2011, the Court entered its *Order Approving Agency Agreement, Store Closing Sales and Related Relief* [D.E. No. 192] (the "**Sale Order**").

11.      The Defendants did not object to the Agency Agreement or to the entry of the Sale Order.

12.      On March 9, 2011, the Agent delivered the Guaranteed Amount (as defined in the Agency Agreement) to the Debtor.

13.      On March 10, 2011, the Agent commenced the "going out of business sales" at the Debtor's stores.

14.    Paragraph 7.2 of the Agency Agreement, approved pursuant to the Sale Order,
provides as follows (italicized emphasis added):

> Credit Card Proceeds.  *Agent shall be allowed to use Merchant's current credit card systems and servicing arrangements (including Merchant's credit card terminals and processor(s), credit card processor coding,) during the course of the Sale*; provided, however, Agent shall establish its own merchant identification numbers as soon as practicable following the Sale Commencement Date; provided further however, Agent shall not be permitted to accept Merchant's proprietary or private label credit card for processing sales of Merchandise in the Closing Stores , unless Agent reaches an agreement with a private label card processor reasonably satisfactory to the Merchant. Merchant shall process credit card transactions, applying customary practices and procedures.  In the event that Merchant is unable to maintain credit card systems and servicing arrangements, it shall give Agent not less than one (1) weeks' prior notice.  At Agent's request, Merchant shall cooperate with Agent to establish merchant identification numbers under Agent's name to enable Agent to process all credit card sales for Agent's account.  Merchant shall deposit the net settlement received from any credit card sales receipts into the Designated Deposit Accounts until Agent opens the Agency Accounts, at which time any credit card sales receipts shall be deposited into the Agency Accounts. Merchant shall prepare a weekly reconciliation of the amounts deposited with respect to the sales of Merchandise by credit plus Sales Taxes less credit card and bank card fees, chargebacks and service charge adjustments, returns allowances and customer credits. Merchant shall not be responsible for paying and Agent shall pay as an Expense hereunder, all credit card fees charges, and chargebacks related to the Sale, whether received during or after the Sale Term.

15.    As permitted by the Agency Agreement, between March 10 and March 12 the
Agent used the Debtor's credit card systems and servicing arrangements with the Defendants to
process credit card sales involving Visa, Mastercard and Discover.    Upon information and
belief, on March 13, 2011, the Agent established its own credit card systems and servicing
arrangements.

16.    Between March 10 and March 12, the Agent processed over $2,442,163 in credit
card sales transactions using the Debtor's processing systems with the Defendants.

17.    On March 16, 2011, the Debtor received correspondence (the "**Termination
Letter**") from NAB, a true and correct copy of which is attached hereto as **Exhibit B**.    In the
Termination Letter, NAB advises the Debtor that it has suspended the Debtor's processing

privileges under the Merchant Agreement, disabled the Debtor's processing terminals effective immediately, "and that no transactions submitted by R & S [Debtor], the Purchaser [Agent] or any other party will be accepted[.]"  Finally, and most egregiously, NAB states that it retained all funds processed on and after March 11, 2011 – which total over $2 million – in addition to funds already placed on reserve.

18.     The Debtor's records reflect that to date, the Defendants have deducted or withheld from the Debtor approximately $461,000 in proceeds of post-petition sale transactions, as well as holding over $860,000 in "reserves" against postpetition receipts.  When added to the sale proceeds admittedly retained by NAB pursuant to the Termination Letter, this totals over $3.2 million in monies due the Debtor and withheld by the Defendants without court authority and in violation of the automatic stay.

19.     The Debtor has retained the services of undersigned counsel and is obligated to pay it a reasonable fee for such services.

20.     All conditions precedent to the bringing of this action have been performed, waived or are otherwise excused.

## COUNT I
## TURNOVER OF PROPERTY TO THE ESTATE

21.     The Debtor realleges and reincorporates all of the allegations set forth in paragraphs 1 through 20 above.

22.     The monies received, reserved, and/or retained by the Defendants as set forth in paragraphs 8, 17 and 18 hereinabove constitute property of the estate as that term is defined in 11 U.S.C. § 541.

23.     As the monies received, reserved, and/or retained by the Defendants as set forth in paragraphs 8, 17 and 18 hereinabove are property of the estate, the Defendants are required by

11 U.S.C. § 542(a) to deliver to the Debtor the full amount of such monies so received, reserved, and/or retained.

24.    Despite demand, the Defendants have failed and refused to turnover the monies received, reserved or retained by the Defendants as set forth hereinabove.

**WHEREFORE**, the Debtor respectfully requests that this Court enter a judgment on its behalf and against the Defendants:

A.    Declaring that the monies received, reserved, and/or retained by the Defendants as set forth in paragraphs 8, 17 and 18 hereinabove constitute property of the estate under 11 U.S.C. § 541;

B.    Directing the Defendants to turnover to the Debtor the monies so received, reserved, and/or retained plus interest thereon, upon the entry of the judgment;

C.    Awarding the Debtor the fees and costs (including reasonable attorneys' fees) of enforcing the Merchant Agreement and obtaining a turnover from the Defendants; and

D.    Granting such other and further relief as may be just and proper.

## COUNT II
## ACCOUNTING

25.    The Debtor realleges and reincorporates all of the allegations set forth in paragraphs 1 through 20 above.

26.    Pursuant to 11 U.S.C. § 542(a), the Defendants are obligated to provide a full accounting of the monies received, reserved, and/or retained by the Defendants as set forth in paragraphs 8, 17 and 18 hereinabove, as the monies so received, reserved, and/or retained by the Defendants constitute property of the Debtor's estate, property that the estate can use, sell or lease, and property which is not of inconsequential value to the estate.

**WHEREFORE**, the Debtor respectfully requests that this Court enter a judgment on its behalf and against the Defendants:

A.      Finding that an accounting is necessary to determine the amount of monies received, reserved, and/or retained by the Defendants as set forth in paragraphs 8, 17 and 18 hereinabove;

B.      Directing the Defendants to account for monies so received, reserved, and/or retained by the Defendants; and

C.      Granting such other and further relief as may be just and proper.

**COUNT III**
**BREACH OF MERCHANT AGREEMENT**
**[AS TO GLOBAL]**

27.      The Debtor realleges and reincorporates all of the allegations set forth in paragraphs 1 through 20 above.

28.      Global breached the Merchant Agreement by issuing or causing NAB to issue the Termination Letter, suspending the Debtor's processing privileges under the Merchant Agreement, disabling the Debtor's processing terminals, withholding monies due to the Debtor on account of post-petition sale transactions, and refusing to accept transactions submitted by the Debtor or the Agent.

29.      Global further breached the Merchant Agreement by, *inter alia*, retaining all funds processed on and after March 11, 2011.

30.      Global's breach of the Merchant Agreement damaged the Debtor in an amount to be established at trial.

**WHEREFORE**, the Debtor respectfully requests that this Court enter a judgment on its behalf and against Global:

3557403-4                                                  7

A.    Finding that Global's actions in issuing or causing NAB to issue the Termination Letter, suspending the Debtor's processing privileges under the Merchant Agreement, disabling the Debtor's processing terminals, refusing to accept transactions submitted by the Debtor or the Agent, and retaining funds on account of post-petition sale transactions, including all funds processed on and after March 11, 2011 constitute breaches of the Merchant Agreement;

B.    Awarding damages to the Debtor with respect to such breaches in an amount to be established at trial;

C.    Awarding the Debtor the fees and costs (including reasonable attorneys' fees) incurred by the Debtor in connection with the breaches of the Merchant Agreement; and

D.    Granting such other and further relief as may be just and proper.

## COUNT IV
## DAMAGES FOR VIOLATION OF SALE ORDER

31.    The Debtor realleges and reincorporates all of the allegations set forth in paragraphs 1 through 20 above

32.    Paragraph 7.2 of the Agency Agreement, which was approved by the Sale Order, provides that "Agent shall be allowed to use Merchant's current credit card systems and servicing arrangements (including Merchant's credit card terminals and processor(s), credit card processor coding,) during the course of the Sale[.]"

33.    The Defendants did not object to the entry of the Sale Order.  The Sale Order is final and non-appealable, and binding on all creditors and parties in interest, including the Defendants.

34.    The Defendants' actions in issuing the Termination Letter, suspending the Debtor's processing privileges under the Merchant Agreement, disabling the Debtor's processing terminals, withholding or retaining funds from the Debtors, including the proceeds of all sale

transactions from and after March 11, and refusing to accept transactions submitted by the Debtor or the Agent were all taken in violation of the Sale Order.

35.     The Defendants' violations of the Sale Order damaged the Debtor in an amount to be established at trial.

**WHEREFORE**, the Debtor respectfully requests that this Court enter a judgment on its behalf and against the Defendants:

A.     Finding that the Defendants' actions in issuing the Termination Letter, suspending the Debtor's processing privileges under the Merchant Agreement, disabling the Debtor's processing terminals, withholding or retaining funds from the Debtors, including the proceeds of all sale transactions from and after March 11, and refusing to accept transactions submitted by the Debtor or the Agent, constitute violations of the Sale Order;

B.     Awarding damages to the Debtor with respect to such violations in an amount to be established at trial;

C.     Awarding the Debtor the fees and costs (including reasonable attorneys' fees) incurred by the Debtor; and

D.     Granting such other and further relief as may be just and proper.

## COUNT V
## DAMAGES FOR VIOLATION OF THE AUTOMATIC STAY

36.      The Debtor realleges and reincorporates all of the allegations set forth in paragraphs 1 through 20 above.

37.     The Defendants' actions in deducting approximately $461,000 in postpetition proceeds for prepetition disputes, as well as holding over $860,000 in "reserves" of post-petition receipts, constitute violations of the automatic stay under 11 U.S.C. § 362(a).

38.     The Defendants were on notice that deducting postpetition proceeds for prepetition disputes and the establishment of postpetition reserves were in violation of the automatic stay in this case, yet failed to remedy such violations despite notice thereof.

39.     The Defendants further violated the automatic stay by issuing the Termination Letter, suspending the Debtor's processing privileges under the Merchant Agreement, disabling the Debtor's processing terminals, refusing to accept transactions submitted by the Debtor or the Agent, and retaining all funds processed on and after March 11, 2011.

40.     The Defendants' violations of the automatic stay damaged the Debtor in an amount to be established at trial.

**WHEREFORE**, the Debtor respectfully requests that this Court enter a judgment on its behalf and against the Defendants:

A.     Finding that the Defendants' actions in establishing postpetition reserves, deducting postpetition proceeds for prepetition disputes, issuing the Termination Letter, suspending the Debtor's processing privileges under the Merchant Agreement, disabling the Debtor's processing terminals, refusing to accept transactions submitted by the Debtor or the Agent, and retaining all funds processed on and after March 11, 2011 constitute violations of the automatic stay;

B.     Awarding damages to the Debtor, including punitive damages, with respect to such violations in an amount to be established at trial;

C.     Awarding the Debtor the fees and costs (including reasonable attorneys' fees) incurred by the Debtor; and

D.     Granting such other and further relief as may be just and proper.

## COUNT VI
## UNAUTHORIZED POSTPETITION TRANSFERS
## UNDER SECTION 549 OF THE BANKRUPTCY CODE

41.     The Debtor realleges and reincorporates all of the allegations set forth in paragraphs 1 through 20 above.

42.     After the Petition Date, the Defendants received transfers of property of the estate (specifically, by establishing a reserve or holdback as security for prepetition chargeback claims of credit card customers) that were not authorized by Order of this Court or by any section of the Bankruptcy Code (such transfers, the "Postpetition Transfers").

43.     The Postpetition Transfers are subject to avoidance under 11 U.S.C. § 549(a).

**WHEREFORE**, the Debtor respectfully requests that this Court enter a judgment on its behalf and against the Defendants:

A.     Declaring the Postpetition Transfers to have been unauthorized postpetition transfers under 11 U.S.C. § 549(a);

B.     Avoiding the Postpetition Transfers;

C.     Awarding the Debtor fees and costs (including reasonable attorneys' fees) of this action; and

D.     Granting such other and further relief as may be just and proper.

## COUNT VII
## RECOVERY OF AVOIDED TRANSFERS - 11 U.S.C. § 550

44.     Debtor hereby incorporates the allegations in paragraphs 1 through 43 as if fully re-alleged herein.

45.     Debtor is entitled to avoid the Transfers pursuant to 11 U.S.C. § 549.

46.     The Defendants were the initial transferee of the Transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Transfers were made.

47.     Pursuant to 11 U.S.C. § 550(a), Debtor is entitled to recover the Transfers from the Defendants, plus interest thereon to the date of payment and the costs of this action.

**WHEREFORE**, the Debtor respectfully requests that this Court enter a judgment on its behalf and against the Defendants:

A.     Enter a judgment against the Defendants as to Count VI of the Complaint;

B.     Avoid the Transfers pursuant to 11 U.S.C. § 549 and grant recovery thereof to the Debtor pursuant to 11 U.S.C. § 550;

C.     Award pre-judgment interest at the maximum legal rate running from the date of each Transfer to the date of judgment herein;

D.     Grant such other and further relief as the Court deems just and proper

Dated: April 18, 2011                          Respectfully submitted,

                                               BERGER SINGERMAN, P.A.
                                               *Counsel for the Debtor*
                                               200 South Biscayne Blvd., Ste 1000
                                               Miami, FL  33131
                                               Telephone:  (305) 755-9500
                                               Facsimile:  (305) 714-4340


                                               By:   */s/ Jordi Guso*
                                                     Jordi Guso
                                                     Florida Bar No. 863580
                                                     jguso@bergersingerman.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the forgoing was served electronically via the Court's CM/ECF or as indicated upon those parties listed below on this 18th day of April 2011.

Scott L. Baena, Esq.
Jay M. Sakalo Esq.
Bilzin Sumberg Baena Price and Axelrod LLP
1450 Brickell Avenue
Suite 2300
Miami, FL 33131-3456
E-mail: sbaena@bilzin.com
E-mail: jsakalo@bilzin.com
**(VIA CM/ECF)**

John J. Lamoureux Esq.
Carlton Fields, P.A.
4221 West Boy Scout Boulevard
Suite 1000
Tampa, FL 33607
E-mail: jlamoureux@carltonfields.com
**(VIA CM/ECF)**

Michael A. Sexton, Esq.
Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC
3344 Peachtree Rd., N.E., Ste. 2400
Atlanta, Georgia
E-mail: msexton@wwhgd.com
**(VIA ELECTRONIC MAIL)**

**Exhibit A**

**Merchant Agreement**

**Exhibit B**

**Termination Letter**

OCT-29-2008 WED 12:50 PM NAB  www.nynab.com          FAX NO. 212 889 5290

APPROVED

**MERCHANT APPLICATION**

Sales Rep: Brian Roth 2

**North American BANCARD**
1-800-BANCARD

| | | |
|---|---|---|
| New Location ☑ | Phone (212) 599-1600 | |
| Additional Location ☐ | | |
| Change of Ownership ☐ | Merchant # 145460 | |
| SIC Code # | Sales Rep # 5003 | Location # ___ of 1 |

Business/Corporate Name: **Robb and Stucky, LTD**
DBA (Doing Business As) Name: **ROBB AND STUCKY**
Location Address: **14550 PLANTATION ROAD**
City, State, Zip: **FT. MYERS, FL 33912**
E-Mail: **erica.woodward@robbstucky.net**
Bank Reference (Name/Phone) **Olsen @ Bank of America** 1-607-3318

Statement Mailing Address (if different from location address)
City, State, Zip
Federal Tax ID Number: **59-2776415**          FAX: **239-437-1777**
Business Phone Number: **239-437-7997**      Contact Name: **ERICA WOODWARD**
Web Site Address (URL): **www.robbstucky.com**
Checking Account # **375145 9538**     Bank Routing # **111000012**

☐ Sole Proprietor   ☐ Partnership   ☑ Corporation   ☐ Non-Profit

| EQUIPMENT PROVIDED BY: |
|---|
| ☐ ISO   ☑ NAB   ☐ MERCHANT |

How long in present business? **80+** Yrs   Number of locations **35**   Do you currently accept Visa/Mastercard/Discover? ☑ Yes ☐ No (If yes, you should submit 3 most current months statements.)

EQUIPMENT TYPE: Pin Debit

Merchandise/Services Sold **FURNITURE**   Monthly Bank Card Sales **$250,000**   Average Ticket Amount **$500**   Highest Ticket Amount **$5800**

**OMNI 3750**

| Percent of Business (Must Be 100%) | | | Sales Method (Must Be 100%) | | |
|---|---|---|---|---|---|
| CARD SWIPED | KEYED WITH IMPRINT OF CARD | KEYED WITHOUT IMPRINT OF CARD | STORE FRONT | OFF PREMISE | MAIL/PHONE ORDER |
| 90 % | 0 % | 10 % | 100 % | 0 % | 0 % |
| | | | TRADE SHOW 0% | INTERNET SERVICES 0% | OTHER 0% |

☐ Purchase   $ ___
☐ Lease   $ ___ /month
☑ Reprogram

American Express   ☐ New Setup   ☑ Existing   Account # **4098480315**

Visa Check/Debit Mastercard   ☑ Check here if you do not wish to accept Visa Check   ☐ Check here if you do not wish to accept Debit MasterCard

Comments: **9 ON TERMINAL**

| Name | Title | Residence Address | City, State, Zip |
|---|---|---|---|
| **Brian Crawley** | **CFO** | **14550 PLANTATION RD** | **FT MYERS FL 3391** |
| Applicant's SS# | Home Phone | Equity Ownership % **100** | Driver's License # |
| Name 2. | Title | Residence Address | City, State, Zip |
| Applicant's SS# | Home Phone | Equity Ownership 0 % | Driver's License # |

**MEMBER BANK (ACQUIRER) INFORMATION:**
HSBC Bank USA, National Association, Merchant Support Group, PO Box 3263, Buffalo, NY 14240, 716-841-6900

| IMPORTANT MEMBER BANK RESPONSIBILITIES | IMPORTANT MERCHANT RESPONSIBILITIES |
|---|---|
| 1. A Visa Member is the only entity approved to extend acceptance of Visa products directly to a merchant. | 1. Ensure compliance with cardholder data security and storage requirements. |
| 2. A Visa Member must be a principal (signer) to the Merchant Agreement. | 2. Maintain fraud and chargebacks below thresholds. |
| 3. A Visa Member is responsible for educating Merchants on pertinent Visa Operating Regulations with which Merchant must comply. | 3. Review and understand the terms of the Merchant Agreement. |
| 4. A Visa Member is responsible for and must provide settlement funds to the Merchant. | 4. Comply with Visa Operating Regulations. |
| 5. A Visa Member is responsible for all funds held in reserve that are derived from settlement. | The Responsibilities listed above do not supersede terms of the Merchant Agreement and are provided to ensure the Merchant understands these specific responsibilities. |

Is Cardholder Data Stored? ☐ Yes ☑ No
If yes, where is the Cardholder Data Stored? ☐ Merchant   ☐ CAP Only   ☐ Both Merchant & CAP   ☐ GAA Export Only

Name of Primary CAP/VAR?                    Name of Secondary CAP/VAR?

All questions regarding merchant processing should be directed to: North American Bancard 889 Chicago Rd.

For Debit Sponsor Contact: Concord EFS Bank 1829 Horizon Lane Dr. Suite 120 Memphis, TN 38133

United Direct 10705 Red Run Blvd. Owings Mills, MD 21117

For Member Contact: HSBC Bank USA, NA Merchant Support Group PO Box 3263 Buffalo, NY 14240 716-841-6900

10/22/2008

Page 1 of 10

TERMS AND CONDITIONS OF MERCHANT SERVICE AGREEMENT

**1. INTRODUCTION AND DEFINITIONS.**
This document, "Terms and Conditions of Merchant Service Agreement" ("Terms and Conditions") accompanies the document "Global Payments Merchant Application" ("Merchant Application"). This Merchant Service Agreement ("Agreement") includes these Terms and Conditions and the terms and conditions of the Merchant Application. The Member bank identified in such Merchant Application ("Member") is a member of Visa USA, Inc.("Visa") and MasterCard International, Inc.("MasterCard"). Global Payments Direct, Inc.("Global") is a registered independent sales organization of Visa, a member service provider of MasterCard and a registered acquirer for Discover Financial Services LLC ("Discover").
Merchant and Global Direct agree that the rights and obligations contained in these Card Services Terms and Conditions do not apply to the Member with respect to Discover transactions and Switched Transactions (as defined below). To the extent Merchant accepts Discover cards, the provisions in this Agreement with respect to Discover apply If Merchant does not have a separate agreement with Discover. To the extent Merchant accepts Discover cards and has a separate agreement with Discover, Discover card transactions shall be processed as Switched Transactions (as defined below).
The Agreement is between Global Direct, the Member and the merchant identified in the Merchant Application ("Merchant"). Under the terms of the Agreement, Merchant will be furnished with the services and products described herein and in the Merchant Application, and selected by Merchant therein (collectively and individually, as applicable, the "Services"). Global Direct will be the sole and exclusive provider of the Services to Merchant during the term of this Agreement. Any Merchant accepted by Global Direct for card processing services agrees to be bound by the Agreement, including the terms of the Merchant Application and these Terms And Conditions as may be modified or amended in the future. A Merchant's submission of a transaction to Global Direct shall be deemed to signify Merchant's acceptance of the Card Services Agreement including the Terms and Conditions herein. Except as expressly stated in the first three paragraphs of Section 13, all terms and conditions of this Card Services Agreement shall survive termination to the extent necessary to protect Global Direct Member's and anyone acting on Global Direct or Member's behalf's rights herein.
**2. SERVICE DESCRIPTIONS.**
Credit Card processing services: Global Direct's actions to the appropriate card associations and/or issuers (e.g., Visa, MasterCard, Diners, Discover), settlement, dispute resolution with cardholders' banks; and transaction-related reporting, statements and products. Debit/ATM Processing Services. Global Direct has connected to the following debit card networks ("Networks") Accel, AFFN, Interlink, MAC, Maestro, NYCE, Pulse, Star, and Tyme Global Direct will provide Merchant with the ability to access the Networks that Global Direct has connected to for the purpose of authorizing debit card transactions at the point of sale from cards issued by the members of the respective Networks. Global Direct will provide connection to such Networks, terminal applications, settlement and reporting activities. EBT Transaction Processing Services: Global Direct offers electronic interfaces to Electronic Benefits Transfer ("EBT") networks for the processing of cash payments or credits to or for the benefit of benefit recipients ("Recipients"). Global Direct will provide settlement and switching services for various Point of Sale transactions initiated through Merchant for the authorization of the issuance of the United States Department of Agriculture, Food and Nutrition Services ("FNS") food stamp benefits ("FS Benefits") and/or government delivered cash assistance benefits ("Cash Benefits, "with FS Benefits, "Benefits") to Recipients through the use of a state-issued card ("EBT Card"). With respect to Visa and MasterCard products, Merchant agrees to pay and Merchant's account(s) will be charged pursuant to Section 5 of this Agreement for any additional fees incurred as a result of Merchant's subsequent acceptance of transactions with any Visa or MasterCard product that it has not elected to accept.
**3. PROCEDURES.**
Merchant will permit holders of valid cards bearing the symbols of the cards authorized to be accepted by Merchant hereunder to charge purchases or leases of goods and services and the debt resulting there from shall be purchased hereunder, provided that the transaction complies with the terms of this Agreement. All indebtedness submitted by Merchant for purchase will be evidenced by an approved sales slip. Merchant will not present for purchase any indebtedness that does not arise out of a transaction between a cardholder and Merchant. Merchant agrees to follow the Card Acceptance Guide which is incorporated into and made part of this Agreement, and to be bound by the operating regulations and rules of Visa, MasterCard, Discover and any other card association or network organization covered by this Agreement, as any of the above referenced documents may be modified and amended from time to time. Without limiting the generality of the foregoing, Merchant agrees to comply with and be bound by, and to cause any third party who provides Merchant with services related to payment processing or facilitates Merchant's ability to accept credit and debit cards and who is not a party to this Card Services Agreement to comply with and be bound by the rules and regulations of Visa, MasterCard, Discover and any other card association or network organization related to cardholders and transaction information security, including without limitation, Payment Card Industry (PCI) Data Security Standards, Visa's Cardholder Information Security Program and MasterCard's Site Data Protection Program. Merchant will indemnify and hold Global Direct, Member and anyone acting on Global Direct or Member's behalf harmless from any fines and penalties issued by Visa, MasterCard, Discover or any card association or network organization arising out of or relating to the processing of transactions by Global Direct and Member at Merchant's location(s) and will reimburse Global Direct for any losses incurred by Global Direct with respect to any such fines or penalties. Global Direct may, from time to time, issue written directions (via mail or Internet) regarding procedures to follow and forms to use to carry out this Agreement. These directions and the terms of the forms are binding as soon as they are issued and shall form part of these Terms and Conditions of the Agreement. Such operating regulations and rules may be reviewed upon appointment at Global Direct's designated premises and Merchant acknowledges that it has had the opportunity to request a review and/or review such operating regulations and rules in connection with its execution of this Card Services Agreement.
**4. MARKETING.**
Merchant shall adequately display the card issuer service marks and promotional materials supplied by Global Direct. Merchant shall cease to use or display such service marks Immediately upon notice from Global Direct or upon termination of this Agreement.
**5. PAYMENT, CHARGES AND FEES.**
Fees and charges payable by Merchant shall be as set forth in the Merchant Application. Merchant will be paid for indebtedness purchased under this Agreement by credit to Merchant's account(s). Merchant's account(s) will be credited for the gross amount of the indebtedness deposited less the amount of any credit vouchers deposited. Merchant shall not be entitled to credit for any indebtedness that arises out of a transaction not processed in accordance with the terms of this Card Services Agreement. Availability of any such funds shall be subject to the procedures of the applicable financial institution. Chargebacks and adjustments will be charged to Merchant's account(s) on a daily basis. Merchant agrees to pay and Merchant's account(s) will be charged for the discount, fees, chargebacks and other fees and charges described in this Agreement. Merchant also agrees to pay and Merchant's account(s) will be debited for all fees, arbitration fees, fines, penalties, etc. charged or assessed by the card associations or network organizations on account of or related to Merchant's processing hereunder, including without limitation with regards to any third party who provides Merchant with services related to payment processing or facilitates Merchant's ability to accept credit and debit cards and who is not a party to this Card Services Agreement. If any type of overpayment to Merchant or other error occurs, Merchant's account(s) may be debited or credited therefore. Merchant represents and warrants that no one other than Merchant has any claim against such indebtedness except as authorized in writing by Member and Global Direct. Merchant hereby assigns to Member and Global Direct all of its right, title, and interest in and to all indebtedness submitted hereunder and agrees that Member and Global Direct have the sole right to receive payment on any indebtedness purchased hereunder.
**6. EQUIPMENT AND SUPPLIES.**
Any advertising material, leased equipment including imprinters, authorization terminals, or printers; software; credit card authenticators; unused forms; and Merchant deposit plastic cards provided by Global Direct will not become Merchant's property. Merchant will protect them from loss, theft, damage or any legal encumbrance and will allow Global Direct and its designated representatives reasonable access to Merchant's premises for their repair, removal, modification, installation and relocation. Merchant acknowledges that any equipment provided under this Agreement is embedded with proprietary technology ("Software"). Merchant shall not obtain title, copyrights or any other proprietary right to any Software. At all time, Global Direct or its suppliers retain all rights to such Software, including but not limited to updates, enhancements and additions. Merchant shall not disclose such Software to any party, convey, copy, license, sublicense, modify, translate, reverse engineer, decompile, disassemble, tamper with, or create any derivative work based on such Software. Merchant's use of such Software shall be limited to that expressly authorized by Global Direct. Global Direct's suppliers are intended third party beneficiaries of this

revision 08/07

Agreement to the extent of any terms herein pertaining to such suppliers' ownership rights; such suppliers have the right to rely on and directly enforce such terms against Merchant. The operating instructions will instruct Merchant in the proper use of the terminals, and Merchant shall use and operate the terminals only in such manner. If Merchant has purchased the maintenance/help desk service hereunder for its terminals, Merchant will promptly notify Global Direct of any equipment malfunction, failure or other incident resulting in the loss of use of the equipment or need for repair or maintenance, whereupon Global Direct will make the necessary arrangements to obtain required maintenance. Merchant is responsible for shipping costs. Merchant shall cooperate with Global Direct in its attempt to diagnose any problem with the terminal. In the event the Merchant's terminal requires additional Software, Merchant is obligated to cooperate and participate in a dial in down line load procedure. With respect to any item of equipment leased to Merchant by Global Direct, Merchant will not be liable for normal wear and tear, provided, however, that Merchant will be liable to Global Direct in the event that any leased item of equipment is lost, destroyed, stolen or rendered inoperative. Merchant will indemnify Global Direct against any loss arising out of damage to or destruction of any item of equipment provided hereunder for any cause whatsoever. Merchant also agrees to hold harmless and indemnify Global Direct for any costs, expenses, and judgments Global may suffer, including reasonable attorney's fees, as a result of Merchant's use of the equipment provided hereunder. Any unused equipment in its original packaging purchased from Global hereunder may be returned to Global Direct at Merchant's expense within 60 days of receipt. Merchant shall receive a refund of any money paid in connection therewith subject to a re-stocking fee of an amount equal to 20 percent of the total purchase price for the returned equipment. No refunds shall be issued for any equipment returned after 60 days.

7. FINANCIAL INFORMATION.
Merchant agrees to furnish Global Direct and Member such financial statements and information concerning Merchant, its owners, principals, partners, proprietors or its affiliates as Global Direct may from time to time request. Global Direct, or its duly authorized representatives, may examine the books and records of Merchant, including records of all indebtedness previously purchased or presented for purchase. Merchant agrees to retain copies of all paper and electronic sales slips and credit slips submitted to Global Direct for a period of two years from submission, or such longer period of time as may be required by the operating rules or regulations of the card associations or network organizations, by law, or by Global Direct as specifically requested in writing in individual cases. Merchant agrees that Global Direct, Member and anyone acting on Global Direct or Member's behalf may seek injunctive relief with respect to Merchant's failure to furnish financial or other information upon request.

8. CHANGE IN BUSINESS.
Merchant agrees to provide Global Direct and Member 60 days prior written notice of its intent to (a) transfer or sell any substantial part (10% or more) of its total stock, assets and/or to liquidate; or (b) change the basic nature of its business, or (c) convert all or part of the business to mail order sales, telephone order sales, or to other sales where the card is not present and swiped through Merchant's terminal. Upon the occurrence of any such event, the terms of this Agreement may be modified to address issues arising there from, including but not limited to requirements of applicable card associations or network organizations.

9. TRANSFERABILITY.
This Agreement is not transferable by Merchant without the written consent of Global Direct and Member. Any attempt by Merchant to assign its rights or to delegate its obligations in violation of this paragraph shall be void. Merchant agrees that the rights and obligations of Global Direct hereunder may be transferred by Global Direct without notice to Merchant. Merchant agrees that the rights and obligations of Member hereunder may be transferred to any other member without notice to Merchant. Merchant acknowledges that the transferable rights of Global Direct and Member hereunder shall include, but shall not be limited to, the authority and right to debit the Merchant's account(s) as described herein.

10. WARRANTIES AND REPRESENTATIONS.
Merchant warrants and represents to Global Direct and Member: (a) that each sales transaction delivered hereunder will represent a bona fide sale to a card holder by Merchant for the amount shown on the sales slip as the total sale and constitutes the binding obligation of the card holder, free from any claim, demand, defense, setoff or other adverse claim whatsoever; (b) that each sales slip or other evidence of indebtedness will accurately describe the goods and services which have been sold and delivered to the card holder or in accordance with his instructions; (c) that Merchant will comply fully with all federal, state and local laws, rules and regulations applicable to its business; (d) that Merchant will fulfill completely all of its obligations to the cardholder and will resolve any customer dispute or complaint directly with the card holder; (e) that the signature on the sales slip will be genuine and authorized by cardholder and not forged or unauthorized; (f) that the sales transaction shall have been consummated and the sales slip prepared in full compliance with the provisions of the Card Acceptance Guide and the operating regulations and rules of the applicable card association or network organization, as amended from time to time; (g) that none of the sales transactions submitted hereunder represent sales by telephone, or mail, or internet, or where the card is not physically present at the Merchant's location and swiped through Merchant's terminal, unless Merchant is specifically authorized in writing by Global Direct to submit such sales slips for purchase, (h) that none of the sales transactions submitted hereunder for purchase represent sales to any principal, partner, proprietor, or owner of Merchant, (i) that, without limiting the generality of the foregoing, each sales transaction submitted hereunder and the handling, retention, and storage of information related thereto, will comply with the rules and regulations of Visa, MasterCard, Discover and any other card association or network organization related to card holder and transaction information security, including without limitation Payment Card Industry (PCI) Data Security Standards, Visa's Cardholder Information Security Program and MasterCard's Site Data Protection Program, and (j) that all of the foregoing warranties or representations is breached, the affected sales slips or other indebtedness may be refused, or prior acceptance revoked and charged back to the Merchant. Furthermore, if Merchant submits for purchase hereunder a sales transaction that is not the result of a sale of Merchant's goods or services offered to the general public or if Merchant submits any sales transactions for purchase hereunder which represents a sale to any principal, partner, proprietor, or owner of Merchant, such sales transaction may be refused or charged back, and Merchant hereby agrees to pay (and Merchant's account(s) will be debited therefore) an additional fee of $100 for each such transaction. Merchant must notify Global Direct if Merchant elects to use the terminal service of American Express, Novus, or any other third party provider. If Merchant elects to use a third-party terminal provider, that provider becomes Merchant's agent for the delivery of card transactions to Global via the applicable card processing network. Merchant agrees to assume full responsibility and liability for any failure of such agent to comply with the operating regulations and rules of the applicable card association or network organization, including without limitation any violation, which results in a chargeback to the Merchant. Merchant also agrees that the obligation hereunder to reimburse the Merchant for the value of the card transactions captured by an agent is limited to the value of the transactions (less applicable fees) received by the card processing network from the agent. NEITHER MEMBER, NOR GLOBAL DIRECT, NOR ANY SUPPLIER MAKES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO ANY TERMINAL, ANY EQUIPMENT FURNISHED IN CONNECTION THEREWITH, OR ANY OF THE SERVICES FURNISHED HEREUNDER.

11. INDEMNITY.
Merchant agrees to satisfy directly with the card holder any claim or complaint arising in connection with the card sale. Merchant agrees to indemnify and hold Global Direct and Member harmless from and against any and all liabilities, losses, claims, damages, disputes, offsets, claims or counterclaims made by a cardholder or any other person or entity with regard to indebtedness sold by Merchant hereunder or any other Service provided hereunder.

12. LIMITATION OF LIABILITY.
Neither Member nor Global Direct shall be liable for failure to provide the Services if such failure is due to any cause or condition beyond such party's reasonable control. Such causes or conditions shall include, but shall not be limited to, acts of God or of the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, shortages of labor or materials, freight embargoes, unusually severe weather, breakdowns, operational failures, electrical power failures, communication failures, unavoidable delays, or other similar causes beyond such party's control. The liability of Global Direct and Member for any loss hereunder, including but not limited to damages arising out of any malfunction of the equipment or the failure of the equipment to operate, the unavailability or malfunction of the Services, personal injury, or property damage, shall, in the aggregate, be limited to actual, direct, and general money damages in an amount not to exceed one (1) month's average charge paid by Merchant hereunder (exclusive of interchange fees, assessments, and any other fees or costs that are imposed by a third party in connection with Merchant's payment processing) for

revision 08/07

Services during the previous twelve (12) months or such lesser number of months as shall have elapsed subsequent to the effective date of this Agreement. This shall be the extent of Global's and Member's liability in the event of any alleged default by Global Direct or Member arising out of or relating in any way to this Agreement, including alleged acts of negligence, breach of contract, or otherwise and regardless of the form in which any legal or equitable action may be brought against Global Direct or Member, whether contract, tort or otherwise, and the foregoing shall constitute Merchant's exclusive remedy. Under no circumstances shall Global Direct or Member be liable for any lost profits, lost interest, or for special, consequential, punitive or exemplary damages, including but not limited to, damages arising out of placement of a Merchant's name on any terminated merchant list for any reason, even if Global Direct or Member has been advised of the possibility of such damages. It is agreed that in no event will Global Direct or Member be liable for any claim, loss, billing error, damage, or expense caused by Global Direct's or Member's performance or failure to perform hereunder which is not reported in writing to Global Direct by Merchant within 60 days of such failure to perform or, in the event of a billing error, within 90 days of the date of the invoice or applicable statement. Merchant expressly waives any such claim that is not brought within the time periods stated herein.

**13. TERM AND TERMINATION.**
This Agreement shall remain in full force and effect for an initial term of three (3) years. This Agreement shall be automatically extended for successive one (1) year periods on the same terms and conditions expressed herein, or as may be amended, unless Merchant gives written notice of termination as to the entire Agreement or a portion thereof at least 60 days prior to the expiration of the initial term or any extension or renewals thereof, in which case this Agreement will terminate at the end of the then-current term. Notwithstanding anything to the contrary set forth herein, in the event Merchant terminates the Agreement in breach of this Section 13, all monthly fees assessed to Merchant under the Agreement and due to Global Direct for the remainder of the then existing term of the Agreement, including all minimum monthly fee commitments, shall be immediately due and payable to Global Direct, and Merchant hereby authorizes Global Direct to accelerate the payment of all such monthly fees and to deduct the total amount, which shall in no case be less than $295 (but shall in no event exceed the maximum amount permitted by applicable state law), from Merchant's account referenced in Section 5, or to otherwise withhold the total amount from amounts due to Merchant from Global Direct, immediately on or after the effective date of termination. If the Merchant's account does not contain sufficient funds for the debit or the amount cannot be withheld by Global Direct from amounts due to Merchant, Merchant shall pay Global Direct the amount due within ten (10) days of the date of Global Direct's invoice for same. The payment of accelerated monthly fees as described here is not a penalty, but rather is hereby agreed by the parties to be a reasonable amount of liquidated damages to compensate Global Direct for its termination expenses and all other damages under the circumstances in which such amounts would be payable. Such amounts shall not be in lieu of but in addition to any payment obligations for Services already provided hereunder or that Global Direct may continue to provide), which shall be an additional cost, and any and all other damages to which Global Direct may be entitled hereunder. Notwithstanding the foregoing, Global Direct may terminate this Agreement or any portion thereof upon written notice to Merchant. Furthermore, Global Direct may terminate this Agreement at any time without notice upon Merchant's default in performing under any provision of this Agreement, upon an unauthorized conversion of all or any part of Merchant's activity to mail order, telephone order, or to any activity where the card is not physically present and swiped through the Merchant's terminal, upon any failure to follow the Card Acceptance Guide or any operating regulation or rule of a card association or network organization, upon any misrepresentation by Merchant, upon commencement of bankruptcy or insolvency proceedings by or against the Merchant, or in the event Global Direct reasonably deems itself insecure in continuing this Agreement. In the event that Global Direct and Member breach the terms and conditions hereof, the Merchant may, at its option, give written notice to Global Direct and Member of its intention to terminate this Agreement unless such breach is remedied within 30 days of such notice. Failure to remedy such a breach shall make this Agreement terminable, at the option of the Merchant, at the end of such 30 day period unless notification is withdrawn. Any Merchant deposit of sales or credit slips that is accepted by Global Direct and Member or by a designated depository after the effective date of termination will be returned to Merchant and will not be credited (or debited) to its account(s). If the deposit has already been posted to Merchant's account(s), said posting will be reversed and the deposit returned to Merchant. Termination of this Agreement shall not affect Merchant's obligations which have accrued prior to termination or which relate to any indebtedness purchased hereunder prior to termination, including but not limited to charge backs even if such charge backs come in after termination. In the event of termination, all equipment leased from Global Direct (but not from any other leasing agent), including but not limited to imprinters, terminals, and printers; all supplies; Card Acceptance Guides; and operating instructions must be returned immediately to Global at Merchant's expense. Notwithstanding the foregoing, if within forty-five (45) days of Merchant's execution of this Agreement Merchant both provides NAB or Global with written notice that it wishes to terminate this Agreement immediately and, if applicable, returns to Global, or anyone acting on Global Direct or Member's behalf, at Merchant's expense any free terminals Merchant received in connection with this Agreement, Merchant shall not be responsible for the payment of the above-referenced accelerated monthly fees, but shall be responsible for compliance with all other terms and conditions set forth in this Agreement, including but not limited to payment for all fees incurred prior to the termination of this Agreement.

**14. RETURNED ITEMS/CHARGEBACKS.**
If a card holder disputes any transaction, if a transaction is charged back for any reason by the card issuing institution, or if Global Direct or Member has any reason to believe an indebtedness previously purchased is questionable, not genuine, or is otherwise unacceptable, the amount of such indebtedness may be charged back and deducted from any payment due to Merchant or may be charged against any of Merchant's accounts or the Reserve Account (as defined below). Merchant acknowledges and agrees that it is bound by the rules of the card associations and network organizations with respect to any chargeback. Merchant further acknowledges that it is solely responsible for providing Global Direct and Member with any available information to re-present a chargeback and that, regardless of any information it provides or does not provide Global Direct and Member in connection with a chargeback, or any other reason, Merchant shall be solely responsible for the liability related to such chargeback. A list of some common reasons for chargebacks is contained in the Card Acceptance Guide provided, however, that such list is not exclusive and does not limit the generality of the foregoing. If any such amount is uncollectible through withholding from any payments due hereunder or through charging Merchant's accounts or the Reserve Account, Merchant shall, upon demand by Global Direct, pay Global Direct the full amount of the charge back. Merchant understands that obtaining an authorization for any sale shall not constitute a guarantee of payment, and such sales slips can be returned or charged back to Merchant like any other item hereunder.

**15. RESERVE ACCOUNT.**
At any time, Global Direct and Member may, at their option, establish a reserve account to secure the performance of Merchant's obligations under this Agreement to such party ("Reserve Account"). The Reserve Account may be funded, at Global Direct's (or anyone acting on Global Direct's behalf's) sole discretion, through any or all of the following: (a) Direct payment by Merchant -- At the request of Global Direct or Member, Merchant will deposit funds in the Reserve Account; (b) The proceeds of indebtedness presented for purchase; or (c) The transfer by Global Direct and Member into the Reserve Account of funds withdrawn from any of the accounts referred to in Section 5 or any other accounts, including certificates of deposit, maintained by Merchant or Merchant's guarantor, if any, with any designated depository or other financial institution. *Merchant and Merchant's guarantor hereby grant Member a security interest in all said accounts and authorize Global Direct (to the extent authorized by Member) or Member to make such withdrawals at such times and in such amounts as it may deem necessary hereunder. Merchant and Merchant's guarantor hereby instruct said financial institutions to honor any requests made by Global Direct and Member under the terms of this provision. Merchant and Merchant's guarantor will hold harmless the financial institutions and indemnify them for any claims or losses they may suffer as a result of honoring withdrawal requests from Global Direct and Member. Merchant hereby agrees that Global Direct and Member may deduct from the Reserve Account any amount owed to such party in accordance with this Agreement. Any funds in the Reserve Account may be held until the later of (a) the expiration of any potentially applicable chargeback rights in respect of purchased indebtedness under the rules and regulations of the card associations or network organizations and (b) the period necessary to secure the performance of Merchant's obligations under the Card Services Agreement, which holding period may extend beyond termination of this Agreement. The Merchant will not receive any interest on funds being held in a Reserve Account. Without limiting the generality of the foregoing, Merchant shall, upon termination of this Card Services Agreement, maintain the sum of at least five percent (5%) of gross sales for the 90 day period prior to termination to be held in a Reserve Account in accordance with the terms of this Card Services Agreement. Global Direct may, at its discretion upon termination of this Agreement, require that the Merchant maintain more than five percent (5%) of gross sales for the 90 day period prior to termination in a Reserve Account.*

revision 08/07

**16. DEFAULT/SECURITY INTEREST.**
Upon failure by Merchant to meet any of its obligations under this Agreement (including funding the Reserve Account), any of the accounts referred to in Section 5 or any other accounts belonging to Merchant or Merchant's guarantor held by any designated depository (or by any other financial institution) may be debited without notice to Merchant, and Merchant and Merchant's guarantor gives Member and Global Direct a security interest in all such accounts for these purposes. The scope of the security interest, and Merchant's and Merchant's guarantor's instructions to its financial institutions to accept withdrawal requests from Global Direct and Member, and Merchant's agreement to hold such institutions harmless and to indemnify them are described above in Section 15. Merchant also agrees that, in the event of a default by Merchant, Member has a right of setoff and may apply any of Merchant's deposit balances or any other monies due Merchant from Member towards the payment of amounts due from Merchant under the terms of this Agreement. The rights stated herein are in addition to any other rights Global Direct and Member may have under applicable law.
**17. AMENDMENTS.**
This Agreement may be amended only in writing signed by Global Direct, Member, and Merchant, except that (a) the Card Acceptance Guide and any and all fees, charges, and/or discounts (including without limitations non-qualified surcharge rates) may be changed immediately, or (b) Global Direct may mail Merchant either a notice describing amendments to this Agreement or an entirely new agreement, which amendments or new agreement will be binding upon Merchant if it deposits sales or credit slips after the effective date of such amendment or new agreement set forth in Global's notice.
**18. WAIVER.**
No provision of this Agreement shall be deemed waived by any party unless such waiver is in writing and signed by the party against whom enforcement is sought. No failure to exercise, and no delay in exercising on the part of any party hereto, any right, power or privilege under this Card Services Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under this Card Services Agreement preclude any other or further exercise thereof or the exercise of any right, power, or privilege.
**19. EXCHANGE OF INFORMATION.**
Merchant authorizes Global Direct to order a credit report on Merchant or any owner, officer, shareholder, partner, proprietor, managing agent or guarantor of Merchant. Merchant hereby authorizes Member or any depository institution to release any financial information concerning Merchant or its accounts to Global Direct. Subsequent credit reports may be ordered in connection with updating, renewing or continuing this Agreement. Upon the written request of any individual who is the subject of a consumer credit report, Global Direct will provide the name and address of the consumer credit reporting agency furnishing such report. if any. Global Direct may exchange information about Merchant, Merchant's owners, principals, partners, proprietors, officers, shareholders, managing agents and guarantors with Member, other financial institutions and credit card associations, network organizations and any other party. Merchant hereby authorizes Global Direct to disclose information concerning Merchant's activity to any card association, network organizations, or any of their member financial institutions, or any other party without any liability whatsoever to Merchant.
**20. GENERAL.**
If any provision of this Agreement or portion thereof is held to be unenforceable, such a determination will not affect the remainder of this Agreement. Paragraph headings are included for convenience only and are not to be used in interpreting this Agreement.
**21. PRESS RELEASE.**
Upon execution of this Card Services Agreement, Global Direct shall have the right to publish a press release announcing the business relationship between Global Direct and Merchant formed by this Card Services Agreement; provided, however, that Merchant shall be given the opportunity to review the language of such press release prior to its publication, and Global Direct will honor all requests by Merchant to amend such language that Global Direct, in its sole discretion, deems reasonable.
**22. NOTICES.**
All notices required by this Agreement shall be in writing and shall be sent by telefax, by overnight carrier, or by regular or certified mail. All notices sent to Global Direct or Member shall be effective upon actual receipt by the Corporate Secretary of Global Payments Direct, Inc. 10 Glenlake Parkway North Tower, Atlanta, Georgia 30328. Any notices sent to Merchant shall be effective upon the earlier of actual receipt or upon sending such notice to the address provided by Merchant in the Merchant Application. The parties hereto may change the name and address of the person to whom all notices or other documents required under this Agreement must be sent at any time by giving written notice to the other party.
**23. MERGER.**
The Agreement, including these Terms and Conditions and the Merchant Application, constitutes the entire Agreement between Merchant, Global Direct, and Member and supersedes all prior memoranda or agreements relating thereto, whether oral or in writing.
**24. CHOICE OF LAW/ATTORNEY'S FEES/VENUE/JURY TRIAL WAIVER.**
Should it be necessary for Global or Member to defend or enforce any of its rights under this Agreement in any collection or legal action, Merchant agrees to reimburse Global and/or Member, as applicable, for all costs and expenses, including reasonable attorney's fees, as a result of such collection or legal action. Merchant waives trial by jury with respect to any litigation arising out of or relating to this Agreement. Global, Member, and Merchant agree that any and all disputes or controversies of any nature whatsoever (whether in contract, tort or otherwise) arising out, relating to, or in connection with (a) this Agreement, (b) the relationships which result from this Agreement, or (c) the validity, scope, interpretation or enforceability of the choice of law and venue provisions of this Agreement, shall be governed by the laws of the State of Georgia, notwithstanding any conflicts of laws rules, and shall be resolved, on an individual basis without resort to any form of class action and not consolidated with the claims of any other parties. Global, Member, and Merchant agree that all actions arising out, relating to, or in connection with (a) this Agreement, (b) the relationships which result from this Agreement, or (c) the validity, scope, interpretation or enforceability of the choice of law and venue provision of this Agreement shall be brought in either the courts of the State of Georgia sitting in Fulton County or the United States District Court for the Northern District of Georgia, and expressly agree to the exclusive jurisdiction of such courts.
**25. EFFECTIVE DATE**
This Card Services Agreement shall become effective only upon acceptance by Global Direct and Member, or upon delivery of indebtedness at such locations as designated by Global Direct for purchase, whichever event shall first occur.
**26. DESIGNATION OF DEPOSITORY.**
The financial institution set forth in the Merchant Application is designated by Merchant as a depository institution ("Depository") for its credit card indebtedness. Such financial institution must be a member of an Automated Clearing House Association. Merchant authorizes payment for indebtedness purchased hereunder to be made by paying Depository therefore with instructions to credit Merchant's accounts. Depository, Member, and/or Global Direct may charge any of Merchant's accounts at Depository for any amount due under this Agreement. Global Direct must approve in writing any proposed changes to the account numbers or to the Depository. Merchant hereby authorizes Depository to release any and all account information to Global Direct or anyone acting on Global Direct's behalf as Global Direct may request without any further authorization, approval or notice from or to Merchant.
**27. FINANCIAL ACCOMMODATION.**
The acquisition and processing of sales slips hereunder is a financial accommodation and, as such, in the event Merchant becomes a debtor in bankruptcy, this Agreement cannot be assumed or enforced, and Global Direct and Member shall be excused from performance hereunder.
**28. DEBIT/ ATM PROCESSING SERVICES: ADDITIONAL TERMS AND CONDITIONS**
Merchant agrees to utilize the Services in accordance with the Agreement, its exhibits or attachments, and Global Direct's instructions and specifications (including but not limited to the Card Acceptance Guide which is incorporated into and made a part of this Agreement), and to provide Global Direct with the necessary data in the proper format to enable Global Direct to properly furnish the Services. Merchant acknowledges that Merchant and Global Direct must comply with all of the requirements, rules, and regulations of the Networks. Copies of the relevant agreements or operating regulations may be made available upon request. Merchant agrees to hold Global Direct harmless from any costs of compliance or failure to comply with any such obligation by Merchant. Global Direct may terminate or modify the provision of Services to Merchant if any of Global Direct's agreements with Networks are terminated for any reason or if any entity threatens to terminate services to Global Direct due to some action or inaction on the part of Merchant. Debit Sponsor shall act as Merchant's sponsor with respect to the

revision 08/07

participation of point-of-sale terminals owned, controlled, and/or operated by Merchant (the "Covered Terminals") in each of the following debit card networks ("Networks"): Accel, AFFN, Alaska Option, CU24, Interlink, Maestro, NYCE, Pulse, Shazam, Star, and Tyme, which Networks may be changed from time-to-time by Debit Sponsor or Global Direct without notice. Merchant may also have access to other debit networks that do not require a sponsor. Global Direct will provide Merchant with the ability to access the Networks at the Covered Terminals for the purpose of authorizing debit card transactions from cards issued by the members of the respective Networks. Global Direct will provide connection to such Networks, terminal applications, settlement, and reporting activities. Merchant will comply with all federal, state, and local laws, rules regulations and ordinances ("Applicable Laws") and with all by-laws, regulations, rules, and operating guidelines of the Networks ("Network Rules"). Merchant will execute and deliver any application, participation, or membership agreement or other document necessary to enable Debit Sponsor to act as sponsor for Merchant in each Network, and Merchant shall obtain all consents, approvals, authorizations, or orders of any governmental agency or body required for the execution, delivery, and performance of the Card Services Agreement. Merchant agrees to utilize the debit card Services in accordance with the Card Services Agreement, its exhibits or attachments, and Global Direct's instructions and specifications (including but not limited to the Card Acceptance Guide which is incorporated into and made a part of this Card Services Agreement), and to provide Global Direct with the necessary data in the proper format to enable Global Direct to properly furnish the Services. Copies of the relevant agreements or operating regulations shall be made available to Merchant upon request.
Merchant will provide prompt written notice to Debit Sponsor and Global Direct in the event that Merchant is subject to any of the following:
i) Conviction for a felony offense or any other crime involving moral turpitude;
ii) Restraining order, decree, injunction, or judgment in any proceeding or lawsuit alleging fraud or deceptive practice on the part of Merchant;
iii) Bankruptcy filing or petition;
iv) Federal or state tax lien;
v) Any material adverse change in the assets, operations, or condition, financial or otherwise, of Merchant;
vi) The threat or filing of any litigation against Merchant, the outcome of which reasonably could have a material adverse effect on the continuing operations of Merchant;
vii) Administrative or enforcement proceeding commenced by any state or federal regulatory agency, including any banking or securities agency
or entity operating an EBT Network, that reasonably could have a material adverse effect on the continuing operations of Merchant; or
viii) Any disciplinary action taken by any Network against Merchant or any principal of Merchant.
Debit Sponsor or Global Direct may terminate or suspend, at Debit Sponsor's discretion, Debit Sponsor's sponsorship of Merchant in any Network or modify the provision of Services to Merchant:
i) Immediately upon notice to Merchant of the occurrence of any of the conditions set forth in items (i), (ii), (iii), (v), or (viii) in the immediately preceding paragraph or if Debit Sponsor's authority to participate in such Network or act as sponsor of Merchant in such Network is terminated by such Network;
ii) Thirty (30) days after written notice by Debit Sponsor or Global Direct to Merchant of the occurrence of any of the conditions set forth in items
(iv), (vi), or (vii) in the immediately preceding paragraph or if Debit Sponsor terminated its membership or participation in such Network;
iii) Immediately up notice to Merchant in the event any financial statement, representation, warranty, statement or certificate furnished ismaterially false or misleading; or
iv) Immediately upon notice to Merchant of the occurrence of any other circumstance with respect to this Section that may reasonably be expected to have an adverse effect on Debit Sponsor or Global Direct.
The parties hereto acknowledge and agree that Global Direct shall pay Debit Sponsor any and all fees and charges related to or arising out of Debit Sponsor's sponsorship of Merchant in the Networks; provided, however, that in the event that Global Direct fails to pay such amounts, Debit Sponsor shall be entitled to recover all such amounts directly from Merchant and Merchant agrees to pay all such amounts. Merchant shall not in any way indicate that Debit Sponsor endorses Merchant's activities, products, or services. Debit Sponsor and Merchant are and shall remain independent contractors of one another, and neither they, nor their respective individual employees, shall have or hold themselves out as having any power to bind the other to any third party. Nothing contained in this Section shall be construed to create or constitute a partnership, joint venture, employer-employee, or agency relationship between Debit Sponsor and Merchant. Merchant shall indemnify and hold harmless Debit Sponsor and Global Direct, their affiliates (including parents and subsidiaries), and their respective officers, directors, employees, successors and assigns, from and against any and all direct or contingent losses, costs, claims, demands, and causes of action (including, without limitation, the cost of investigating the claim, the cost of litigation, and reasonable attorneys' fees, whether or not legal proceedings are instituted) paid or incurred by or on behalf of Debit Sponsor or Global Direct as a result of Merchant's violation of any of the terms of this Section, Network Rules, or Applicable Laws, or otherwise arising from or related to Debit Sponsor's sponsorship of Merchant in any Network. Debit Sponsor shall in no way be liable for any act or omission of Global Direct under the Card Services Agreement. In the event that Debit Sponsor's sponsorship of merchant in any Network is terminated prior to the termination of the Card Services Agreement, Global Direct may assign Debit Sponsor's rights and obligations hereunder to a third party. All provisions in this Section necessary to enforce the rights and obligations of the parties contained in this Section shall survive the terminations of Debit Sponsor's debit sponsorship of Merchant under the Card Services Agreement. Debit Sponsor may assign this Agreement to any parent, subsidiary, affiliate, or successor-in-interest.
DEBIT CARD MERCHANT
Each debit card transaction will be assessed the network's acquirer fee in addition to the debit card per item fee quoted in the Card Services Fee Schedule of the Merchant Application
29. MERCHANTACCEPTANCE OF EBT TRANSACTIONS: ADDITIONAL TERMS AND CONDITIONS.
Merchant agrees to issue Benefits to Recipients in accordance with procedures specified herein, and in all documentation and user guides provided to Merchant by Global Direct, as amended from time-to-time (including but not limited to the Card Acceptance Guide which is incorporated into and made a part of this Card Services Agreement); and pursuant to the Quest Operating Rules (the "Rules"), as amended from time-to-time, issued by the National Automated Clearing House Association as approved by the Financial Management Service of the U.S. Treasury Department. Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed them in the Rules. Merchant will provide each recipient a receipt of each Benefit issuance. Merchant will be solely responsible for Merchant's issuance of Benefits other than in accordance with authorizations. Merchant agrees to comply with all the requirements, laws, rules and regulations pertaining to the delivery of services to Benefit Recipients and Benefit Recipient confidentiality. If Merchant issues FS Benefits under this Card Services Agreement, Merchant represents and warrants to Global Direct that Merchant is and FNS-authorized "Merchant" (as such term is defined in the Rules) and is not currently suspended or disqualified by FNS. Merchant agrees to secure and maintain at its own expense all necessary licenses, permit, franchises, or other authorities required to lawfully effect the issuance and distribution of Benefits under this Card Services Agreement, including without limitation, any applicable franchise tax certificate and non-governmental contractor's certificate, and covenants that Merchant will not issue Benefits at any time during which Merchant is not in compliance with the requirements of any applicable law. Merchant agrees to hold Global Direct harmless from any costs of compliance or failure to comply with any such obligation by Merchant. Global Direct may terminate or modify the provision of Services to Merchant if any of Global Direct's agreements with governmental EBT agencies are terminated for any reason or if any party threatens to terminate services to Global Direct due to some action or inaction on the part of Merchant. If any of these Card Services Terms & Conditions are found to conflict with Federal or State law, regulation or policy of the Rules, these Card Services Terms & Conditions are subject to reasonable amendment by Global Direct, the State or its EBT Service Provider to address such conflict upon ninety (90) days written notice to Merchant, provided that Merchant may, upon written notice, terminate the Card Services Agreement upon receipt of notice of such amendment. Nothing contained herein shall preclude the State from commencing appropriate administrative or legal action against Merchant or for making any referral for such action to any appropriate Federal, State, or local agency. Any references to "State" herein shall mean the State in which Merchant issues Benefits pursuant hereto. If merchant issues Benefits in more than one State pursuant hereto, then the reference shall mean each such State severally, not jointly.
30. DISCOVER PROGRAM MARKS
Merchant is hereby granted a limited non-exclusive, non-transferable license to use Discover brands, emblems, trademarks, and/or logos that identify Discover cards ("Discover Program Marks"). Merchant is prohibited from using the Discover Program Marks other than is expressly

revision 08/07

authorized in writing by Global Direct. Merchant shall not use the Discover Program Marks other than to display decals, signage, advertising and other forms depicting the Discover Program Marks that are provided to Merchant by Global Direct pursuant to this Card Services Agreement or otherwise approved in advance in writing by Global Direct. Merchant may use the Discover Program Marks only to promote the services covered by the Discover Program Marks by using them on decals, indoor and outdoor signs, advertising materials and marketing materials; provided that all such uses by Merchant must be approved in advance by Global Direct in writing. Merchant shall not use the Discover Program Marks in such a way that customers could believe that the products or services offered by Merchant are sponsored or guaranteed by the owners of the Discover Program Marks. Merchant recognizes that it has no ownership rights in the Discover Program Marks and shall not assign to any third party any of the rights to use the Discover Program Marks

## 31. MID AND NON-QUALIFIED SURCHARGES/CROSS-BORDER FEES

Merchant pricing appears in the Card Services Fee Schedule of the Merchant Application. T&E merchants (airline, car rental, cruise line, fast food, lodging, restaurant, travel agent, transportation) may have separate rates quoted for consumer and commercial (business) transactions. Transactions that do not clear as priced are subject to MID or non-qualified surcharges (MID/NQS) that are billed back to you on your monthly statement. The most predominate market sectors and applicable MID or non-qualified surcharge rates appear below. Most MID or non-qualified surcharges can be avoided by using products that support authorization and market data requirements established by the card associations and that are subject to change from time to time. Some MID or non-qualified surcharges occur on specific types of cards (including without limitation Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, MasterCard World Elite Card and "foreign" cards issued outside the United States), if the merchant accepts credit cards.  **Unless your Card Services Fee Schedule specifically addresses commercial cards (i.e., Business Cards, Corporate Cards, Fleet Cards, GSA Cards, Purchase Cards), you will be billed back for the higher cost of acceptance of commercial cards; this is also unavoidable based on the card association requirement to accept all types of credit cards, if the merchant accepts credit cards, unless you are primarily a business-to-business supplier with corresponding pricing based on acceptance of commercial cards.**  The card associations require that information from the original authorization, including a life cycle identifier, be retained and returned with subsequent authorizations and/or the settled transaction data. The card associations validate this information as part of the clearing and settlement process. If authorization data is not retained and returned at settlement, then the transaction will not clear as priced and will incur MID/NQS.

*The items listed in this Section 31 are not and are not intended to be a comprehensive list of all instance in which non-qualified surcharges may apply. Non-qualified surcharges may apply in additional situations. All non-qualified surcharges include additional fees assessed by the applicable card association and Global Direct.*

Merchant will also be assessed Cross-Border fees for international MasterCard and Maestro transactions. Any transaction between the merchant and a MasterCard or Maestro card holder outside the United States will be assessed an additional fee, which will be displayed as a separate item on Merchant's monthly statement. All references to non-qualified surcharges in this Section 31 shall include both mid-qualified and non-qualified surcharges.

## MID AND NON-QUALIFIED SURCHARGES FOR PREDOMINANT MARKET SECTORS

### Retail/Restaurant Electronic Merchant

*If you are a Retail Merchant or a Restaurant Merchant with retail-only pricing (no Business Card Rate) and utilize a certified terminal product or electronic system for authorization and settlement through Global Direct, each consumer card transaction you submit which meets all of the following requirements will be priced at the rate quoted. Each transaction not processed as outlined, including without limitation retail commercial card transactions in addition to transactions using Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, MasterCard World Elite Card and all Commercial Cards, will be priced at the non-qualified rate quoted in the Merchant Application.*

· Obtain a single electronic authorization with magnetic strip read or contactless data capture (electronic imprint) at the time of sale.
· Obtain a single electronic authorization and settle for authorized amounts.
· Obtain a cardholder signature (unless transaction is eligible for No Signature Required [NSR] program).
· Settle and transmit batches same day via your terminal/electronic system.
· The electronic authorization amount must be equal to the transaction amount on all Visa debit card transactions unless a Restaurant (MCC 5812), Fast Food (MCC 5814), Service Station (MCC 5541) or Bar/Tavern (MCC 5513), Beauty/Barber Shop (MCC 7230), or Taxi/Limousines (MCC 4121).
· The electronic authorization amount must be equal to the transaction amount on Discover retail transactions except that Taxi Limousines (MCC 4121) and Beauty/Barber Shop (MCC 7230) merchant transactions may vary up to 20%.   Restaurant (MCC 5812), Fast Food (MCC 5814), Service Station (MCC 5541) or Bar/Tavern (MCC 5513) transactions may vary by more than 20% from the electronic authorization without incurring NQS.

### Restaurant Electronic Merchant

*If you are a Restaurant Merchant MCC 5812 or Fast Food Merchant MCC 5814 and utilize a certified terminal product or electronic system for authorization and settlement through Global Direct, each consumer card transaction you submit which meets all of the following requirements will be priced at the rate quoted. Each transaction not processed as outlined, in addition to transactions using Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, and MasterCard World Elite Card will be priced at the non-qualified rate quoted in the Merchant Application. Commercial Card transactions that meet these requirements will be subject to the Business Card rate quoted in the Fee Schedule. Commercial Card transactions not processed in accordance with these requirements will be subject to the non-qualified rate quoted in the Merchant Application.*

· Obtain a single electronic authorization with magnetic strip read or contactless data capture (electronic imprint) at the time of sale.
· Obtain a cardholder signature (unless transaction is eligible for NSR program).
· Settle and transmit batches same day via your terminal/electronic system.

### Supermarket Electronic Merchant

*If you are an approved (certified) supermarket merchant and utilize a terminal or electronic system for authorization and settlement through Global Direct, each transaction you submit which meets all of the following requirements will be priced at the rate(s) quoted for Supermarket Credit Card and Supermarket Check Card. Each transaction not processed as outlined, in addition to transactions using Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, MasterCard World Elite and commercial cards, will be priced at the non-qualified rate quoted in the Merchant Application.*

· Obtain a magnetic strip read (card swipe/contactless data capture/electronic imprint) at the time of sale.
· Obtain a single electronic authorization and settle for authorized amounts.
· Obtain a cardholder signature (unless transaction is eligible for NSR program).
· Settle and transmit batches same day via your terminal/electronic system.
· The electronic authorization amount must be equal to the transaction amount on all Visa debit card transactions.

### Developing Market Electronic Merchant

*If you qualify as a Developing Market Merchant (as defined by Association guidelines from time to time) and utilize a terminal or electronic system for authorization and settlement through Global Direct, each transaction you submit which meets all the following requirements will be priced at the rates quoted. Any other transaction, including commercial card transactions, Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, and MasterCard World Elite Card, and non-magnetic stripe read foreign transactions will be priced at the non-qualified rate quoted in the Merchant Application. In addition, each Visa transaction not processed as outlined, but transmitted same day or next day via your terminal/electronic system, will be priced at the non-qualified rate quoted in the Merchant Application.*

· Obtain a single electronic authorization.
· Settle and transmit batches same day via your terminal/electronic system.
· Provide market data as required. See Note.

revision 08/07

NOTE: If card is non present and a magnetic stripe read does not occur, then Merchant may be required to comply with "Direct Marketer" market data requirements including AVS request on cardholder billing address at time of authorization. If card is present and cardholder signature is obtained, however the magnetic stripe is damaged, then Merchant may be required to obtain AVS match on cardholder billing address zip code

**Direct Marketer Electronic Merchant**

If you are a Direct Mail/Telephone Order Merchant (non-magnetic swipe read transactions), and utilize a certified terminal product or electronic system for authorization and settlement through Global Direct, each transaction you submit which meets all of the following requirements will be priced at the rate quoted. Any other transaction, including all foreign transactions and commercial card transactions in addition to transactions using Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, and MasterCard World Elite Card will be priced at the non-qualified rate quoted in the Merchant Application.

• Obtain an electronic authorization and settle for authorized amounts (one reversal permitted on Visa transactions to make authorization amount equal to settle amount).

• Address Verification Request in authorization on cardholder billing address.  For Discover transactions, Merchant must obtain full address verification request on street number and/or 9 digit postal code.

• CID verification for Discover merchants on non-recurring transactions.

• Purchase date (settled date) is ship date.

• Send order number with each transaction.

• Settle and transmit batches same day via your terminal/electronic system.

• Send level 3 data (line item detail, sales tax, customer code) with every eligible commercial card transaction.

NOTE: Card Not Present transactions involving one-time, recurring, or installment bill payment transactions are subject to additional card association requirements which must be complied with to avoid NQS. Electronic commerce transaction requirements are also subject to additional card association requirements which must be complied with to avoid NQS. Please refer to Card Acceptance Guide for additional requirements

**Purchase Card Electronic Merchant**

If you are a Purchase Card Merchant (non-magnetic swipe read transactions) and utilize a certified terminal product or electronic system for authorization and settlement through Global Direct, each transaction you submit which meets the following requirements will be priced at the rate quoted. Each Visa transaction not processed as outlined, but transmitted same day or next day via your terminal/electronic system, will be priced at the non-qualified rate quoted in the Merchant Application. Each Visa business and commercial card transaction will be priced at the rate quoted plus 1.09%. Any other transaction that does not meet the following requirements, including without limitation foreign transactions, tax-exempt Visa Commercial transactions, Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, and MasterCard World Elite Card, will be priced at the non-qualified rate quoted in the Merchant Application.

• Obtain an electronic authorization and settle for authorized amounts (one reversal permitted on Visa transactions to make authorization amount equal to settled amount).

• Address Verification Request in authorization on cardholder billing address.

• Purchase date (settled date) is ship date.

• Send order number (customer code) with each transaction.

• Send tax amount with every transaction.

• Send Level 3 data (line item detail) with every eligible commercial card transaction.  Sales tax exempt transactions will not be considered to meet these requirements unless they include Level 3 data (line item detail).

• Settle and transmit batches same day via your terminal/electronic system.

**Lodging/Auto Rental Electronic Merchant**

If you are a Lodging or Auto Rental Merchant utilizing a terminal or electronic system for authorization and settlement through Global Direct, each consumer card transaction you submit which meets the following requirements will be priced at the rate quoted. Each transaction not processed as outlined, including without limitation non-magnetic stripe read foreign transactions, and transactions using Visa Rewards Card, Visa Signature Card, Visa Signature Preferred Card, Visa Infinite Card, MasterCard Rewards Card, MasterCard World Card, MasterCard World Elite Card will be priced at the rate plus 1.48%. Commercial Card transactions that meet these requirements will be subject to the Business Card rate quoted in the Fee Schedule. Commercial Card transactions not processed in accordance with these requirements will be subject to the non-qualified rate quoted in the Merchant Application.

• Obtain a magnetic swipe read (card swipe/electronic imprint) at the time of check-in.

• Obtain additional electronic authorizations or send partial reversals to bring total authorized amount within 15% of settled amount. Authorizations must meet card association requirements.

• Obtain a cardholder signature for final transaction amount.

• Purchase Date is hotel check-out date/auto return date.

• Length of guest stay/rental in initial authorization.

• Hotel Folio/Rental Agreement Number and check-in date/check-out date transmitted with each transaction.

• Additional market data may be required for commercial card transactions to avoid NQS. Lodging merchants who (1) accept credit cards for advance payment; (2) guarantee reservations using a credit card; or (3) provide express check-out services to guests, must comply with additional card association requirements for these services in addition to additional authorization and settlement market data requirements.  Lodging merchants who subject charges to final audit and bill for ancillary/additional charges must comply with additional bank card association requirements for these services in addition to additional authorization and settlement market data requirements to avoid NQS. These transactions may also be subject to the rate quoted plus 1.48%. Please see Card Acceptance Guide for requirements and best practices for these transactions.

**TouchTone Capture Merchant**

Transactions which utilize our TouchTone Capture system for authorizations and settlement, settle beyond 48 hours, or are not transmitted via the TouchTone Capture system, will be priced at the non-qualified rate quoted in the Merchant Application.

**Paper Deposit Merchant**

Non-terminal/electronic paper deposit transactions will be priced at the rate quoted in the Card Services Fee Schedule of the Merchant Application.

**Debit Card Merchant**

Each debit card transaction will be assessed the network's acquirer fee in addition to the debit card per item fee quoted in the Card Services Fee Schedule of the Merchant Application.

**Card Present / Mag Stripe Failure:**

A magnetic stripe read is also referred to as an electronic imprint. If the magnetic stripe is damaged, then other validation means may be required to protect against counterfeit cards and merchant must obtain a manual imprint. Most products will prompt for cardholder billing zip code and perform an AVS check for a zip code match. CID verification is recommended for Discover key-entered transactions.  Key-entered retail transactions are subject to higher interchange and NQS.

**The foregoing information regarding NQS is not comprehensive and is subject to change by the card association. Additional or different rates or fees may apply based on the details of a subject transaction.**

revision 08/07

OCT-29-2008 WED 12:51 PM NAB www.nynab.com

FAX NO. 212 889 5200

P. 03/05

Phone: (212) 889-1800

Fax: (248) 283-6291

## MERCHANT APPLICATION (cont.)

### COMPLETE IF YOUR SALES ARE GENERATED THROUGH MAIL/TELEPHONE/INTERNET

1. Description of product sold: _____
2. Who owns product? ☐ Merchant   ☐ Vendor (Drop Ship Required)
3. List the name(s) of vendors from which the product is purchased. _____
4. How do you advertise?  ☐ Catalog/Direct Mail/Flyers   ☐ TV or Radio   ☐ Internet (list Web Page Address) _____
5. How does the customer order the product?  ☐ Mall   ☐ Telephone   ☐ Fax   ☐ Internet
6. Do your customers sign a service agreement with you?   ☐ Yes   ☑ No
7. If Yes, what is the timeframe of the service agreement?   ☐ Monthly   ☐ Quarterly   ☐ Annual
8. Name of Fulfillment House (if any) _____   Inspected   ☐Yes ☐No   Date Inspected _____
9. Are consumers required to provide a deposit?   ☐ Yes   ☑ No
10. Delivery Time Frame: ☐ 0-7 Days   ☐ 8-14 Days   ☐ 15-30 Days   ☐ More than 30 Days
11. Shipping Service Used:  ☐ Fed Ex   ☐ UPS   ☐ Airborne   ☐ Express Mail   ☐ By Merchant
12. What is your return or refund policy? _____
13. When you receive an authorization, how long before the merchandise is shipped? _____
14. In what geographic areas will the product be marketed and sold? _____

### BUSINESS TRADE SUPPLIERS (LIST TWO)

| Name | Address Contact | Phone |
|------|-----------------|-------|
|      |                 |       |
| Name | Address Contact | Phone |
|      |                 |       |

### MERCHANT SITE SURVEY REPORT (To Be Completed by Sales Representative)

Merchant Location:  ☐ Store Front   ☐ Office Building   ☐ Warehouse   ☐ Residence   ☐ Other _____

Landlord Telephone Number _____

The Merchant:                    Landlord Name
☐ Owns   ☐ Leases the Premises

I hereby verify that this application has been fully completed by merchant applicant and that I have inspected the business premises of the merchant at this address and the information stated above is true and correct to the best of my knowledge and belief.

| Verified and Inspected by (Print Name) | Representative Signature | Date |
|----------------------------------------|--------------------------|------|
| BRun                                   |                          | Oct /18/08 |

### PRICING SCHEDULE

**Retail**
(if any % is Swiped)
Interchange Passthrough +0 Basis Points
Transaction Fee: $0.37

* Actual Interchange Passthrough and Assesments plus 0 BPS.

**MOTO/Internet**
(100% Keyed only)
Interchange Passthrough +0 Basis Points
Transaction Fee: $0.37
(Must use AVS)

* Actual Interchange Passthrough and Assesments plus 0 BPS.

X

**Other Fees (if applicable)**

| | |
|---|---|
| Touch Tone Transactions: | $ 0.60 |
| T & E Draft Capture Transactions: | $ 0.60 |
| Address Verification: | $ 0.10 |
| Batch Header: | $ 0.00 * |
| Wireless Transaction Fee: | $ 0.00 * |
| Wireless Network Access (Monthly): | $ 0.00 * |
| Wireless Activation Fee: | $ 0.00 |
| Debit Transaction: | $ 0.35 |
| Debit Gateway (Monthly): | $ 5.00 |
| EBT Transaction Fee: | $ 0.00 |
| Internet Gateway Fee (Monthly): | $ 0.00 * |
| Internet Transaction Fee: | $ 0.00 * |
| Monthly Minimum Discount Fee: | $ 25.00 |
| Monthly Basic Service Fee: | $ 0.00 * |
| Chargeback Fee: | $ 25.00 |
| Retrieval Fee: | $ 15.00 |
| Voice Authorization Fee: | $ 1.00 |

See Terms and Conditions of Merchant Service Agreement for further information on Mid and Non-Qualified Surcharges.

☐ Yes, I want to participate in the Merchant Club Program which includes all your supplies, an extended warranty, and overnight replacement on equipment for $14.00 per month.

Initial Here

Page 9 of 10

Revision 08/07

OCT-29-2008 WED 12:51 PM NAB www.nynab.com

Sales Rep:Brian Roth 2

FAX NO. 212 889 5200          P. 04/05

Phone: (212) 889-1800          Fax: (248) 283-6291

## MERCHANT ACCEPTANCE

A copy of the Card Services Terms and Conditions, revision number 08/07, has been provided to you. Please sign below to signify that you have received a copy of the Card Services Terms & Conditions and that you agree to all terms and conditions contained therein. The undersigned is duly authorized to sign on behalf of the Merchant and to bind the Merchant to the terms and conditions set forth in this Merchant Application and Merchant Service Agreement ("Agreement"), which terms and conditions are hereby acknowledged and agreed to by the Merchant, and certifies that all information provided in this Merchant Application is true, correct and complete. The undersigned, on behalf of the Merchant, authorizes Global Direct and the Member or any credit reporting agency employed by the Member or any agent of the Member, to make whatever inquires the Member deems appropriate to investigate, verify or research references, statements or data obtained from Merchant for the purpose of this Merchant Application and for accompanying POS terminals or equipment financing. The undersigned, on behalf of the Merchant, authorizes (i)Global Direct, or (ii)the Member, or (iii)solely with respect to uncollected merchant fees, and subject to and only as pursuant to North American Bancard's separate written agreement with Global Direct, North American Bancard, or, (iv)solely with respect to supplies and/or hardware related to merchant business under this Merchant Application, North American Bancard, to initiate automated deposit or debit (ACH) entries to the Merchant's bank account as indicated on this Merchant Application or subsequently provided by Merchant. A MERCHANT'S SUBMISSION OF A TRANSACTION TO GLOBAL DIRECT SHALL BE DEEMED TO SIGNIFY MERCHANT'S ACCEPTANCE OF THE AGREEMENT, INCLUDING THE TERMS AND CONDITIONS HEREIN.

**Sign Here** | #1 From Application - Signature _____ | Date 10/23/08

**Sign Here** | #2 From Application - Signature _____ | Date _____

INDIVIDUAL GUARANTY (NO TITLES)I/We hereby guarantee to Global Direct, Member and to Debit Sponsor, their successors and assigns, the full, prompt and complete performance of Merchant and all of Merchant's obligations under this Agreement, including, but not limited to, all monetary obligations arising out of Merchant's performance or nonperformance under this Agreement, whether arising before or after termination of this Agreement. The guaranty shall not be discharged or otherwise affected by any waiver, indulgence, compromise, settlement, extension of credit, or variation of terms of this Agreement made by or agreed to by Global Direct, Member, Debit Sponsor, and/or Merchant. I/We hereby waive any notice of acceptance of this guaranty, notice of non-payment or non-performance of any provision of this Agreement by Merchant, and all other notices or demands regarding this Agreement.I/We agree to promptly provide to Global Direct, Member and Debit Sponsor any information requested by either of them from time to time, concerning my/our financial condition(s), business history, business relationships and employment information. I/We have read, understand, and agree to be bound by the terms and conditions contained in this Agreement on pages 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10.

**Sign Here** | #1 From Application - Signature _____ | Date _____

**Sign Here** | #2 From Application - Signature _____ | Date _____

### For Office Use Only

| | |
|---|---|
| X _____ Application Accepted by North American Bancard | Date |
| X _____ Accepted by HSBC Bank USA NA | Date |
| X _____ Accepted by Global Direct | Date |
| X _____ Concord EFS National Bank - Debit Sponsor | Date |

Place Voided Check here



All questions regarding Merchant Processing should be referred to: North American Bancard
Billing disputes must be forwarded, in writing to Customer Care     Customer Care Center
within 60 days of the date of the statement and/or notice.          968 Chicago Rd
                                                                     Troy, MI 48083
                                                                     Fax: (248) 269-2222

**Exhibit B**

**Termination Letter**



**NORTH AMERICAN BANCARD, LLC**
**250 STEPHENSON HIGHWAY**
**TROY, MICHIGAN  48083**

March 16, 2011

*__Via Federal Express__*

Ms. Kim Wood
Corporate Staff Accountant
Robb & Stucky, LTD
14550 Plantation Road
Fort Myers, FL  33912

> Re:  Termination of Merchant Agreement, dated October 23, 2008 (the "Merchant
> Agreement")

Dear Ms. Wood:

Yesterday, North American Bancard, LLC ("NAB") learned that the card transactions purportedly submitted on behalf of Robb & Stucky, LTD ("R & S") on and after March 11, 2011, were in fact transactions that did not involve R & S, its customers, or its goods.  Instead, it appears that Hudson Capital Partners, LLC and HYPERAMS, LLC (collectively, the "Purchaser"), the court-approved purchaser of the R & S inventory, was the entity on behalf of whom these transactions were processed.  Based upon statements made yesterday by counsel for R&S and the Purchaser, the Purchaser has utilized R & S' processing equipment and privileges to complete card transactions between it and its customers, relating to inventory that it purchased from R & S on March 8, 2011.  This is directly contrary to representations made to the Bankruptcy Court on behalf of R & S and the Purchaser, and confirmed by the Bankruptcy Judge on March 8, 2011 – i.e., that the Purchaser would be utilizing the processing services of a third party in connection with the pending "going out of business sale", and not those of NAB and Global Payments Direct, Inc. ("Global").  As of yesterday, these transactions totaled in excess of $2,070,000.

Please be advised that these transactions violate Visa and MasterCard operating rules and regulations, and as well violate the terms of the Merchant Agreement.  To begin with, Visa International Operating Regulations, issued October 15, 2010 (the "Visa Regulations"), provide that an "Acquirer" (i.e., Global) is not permitted to process transactions with any merchant with whom it does not have a written merchant agreement.  In this regard, and to NAB's knowledge, Global does not have any written agreement with the Purchaser.  The MasterCard rules, dated as of December 10, 2010 (the "MC Rules"), further provide that an Acquirer can only process transactions between the merchant and its customer.

Ms. Kim Wood
March 16, 2011
Page 2

Turning to the Merchant Agreement, R & S warrants and represents in Section 10 that "each sales transaction delivered hereunder will represent a bona fide sale to a card holder" by R&S. R&S also warrants and represents that each such sales transaction "will comply with the rules and regulations of Visa, MasterCard, Discover and any other card association or network organization...."

In simple terms, subject transactions were between the Purchaser and its customers, and not between R & S and its customers. As such, they violated, among other things, Visa Regulations, MC Rules and the Merchant Agreement.

Under Visa Regulations and MC Rules, NAB is required to notify both Visa and MasterCard of these improper transactions. NAB has no choice in this matter, as the failure to take this action on an immediate basis could result in the termination of NAB's privileges as a registered independent sales organization of Visa and as a registered member service provider of MasterCard. It is also important to note that these violations could result in substantial fines and penalties being assessed against Global, NAB and R & S under the Visa Regulations and MC Rules. Finally, the possibility exists that Global may require that each of these improper transactions be reversed, which would result in the transaction proceeds being returned to the respective card holders.

The actions of R & S and the Purchaser constitute very serious violations of Visa Regulations and MC Rules. They could have substantial and irreparable consequences for Global and NAB. NAB intends to hold R&S, the Purchaser and its and their affiliates responsible for any damages that it incurs, and specifically reserves all rights and remedies in the pursuit of its claims.

Based upon the foregoing, please be advised that Global and NAB hereby suspend R&S' processing privileges under the Merchant Agreement, pending further investigation into this matter. This means that R&S' processing terminals will be disabled effective immediately, and that no transactions submitted by R & S, the Purchaser or any other party will be accepted by Global or NAB. NAB will also retain all funds processed on and after March 11, 2011 (in addition to funds already placed on reserve), pending further investigation and disposition by NAB, Global and, if necessary, Visa, MasterCard and the other card associations and network organizations.

Please be guided accordingly.

Very truly yours,
North American Bancard, LLC

By:
Gary Rutledge
Chief Operating Officer

cc  Global Payments Direct, Inc.
    John Lamoureux, Esq.
    Ben Crowley, CFO, Robb & Stucky, LTD.